John AARON et al., Plaintiffs,

v.

William G. COOPER et al.,
Defendants.

Civ. A. No. 3113.

United States District Court
E. D. Arkansas, W. D.

Aug. 27, 1956.

A. F. House, Frank E. Chowning,. Leon B. Catlett, Henry E. Spitzberg, Richard C. Butler, Little Rock, Ark., for plaintiffs.

U. Simpson Tate, Dallas, Tex., Wiley A. Branton, Pine Bluff, Ark., Thurgood Marshall, Robert L. Carter, New York City, for defendants.

JOHN E. MILLER, District Judge.

This cause was tried to the court on August 15, 1956.

At the conclusion of the evidence, the case was argued orally by the able counsel for the respective parties and was submitted to and taken under advisement by the court.

The pleadings and evidence, along with the arguments and contentions of the attorneys, have been fully considered, and the court now files this opinion in lieu of formal findings of fact and conclusions of law, and incorporates herein as a part hereof the findings of fact and conclusions of law as provided by Rule 52(a), Fed.Rules Civ.Proc. 28 U.S.C.A.

On February 8, 1956, the minor plaintiffs between the ages of 6 and 21 years, through their legal representatives, filed their complaint in this court against the President and Secretary of the Board of

Directors of Little Rock School District; the Superintendent of Little Rock School District; and the Little Rock School District itself.

The complaint is prolix and contains many redundant allegations. In brief, the plaintiffs alleged that the defendants conspired and will continue to conspire to deprive the minor plaintiffs and members of the class of persons that they represent of their rights, privileges, and immunities as citizens of the United States and of the State of Arkansas by providing, affording, operating, and maintaining separate, segregated public free schools within the defendant District, for the minor plaintiffs and the members of the class of persons they represent because of their race and color contrary to and in violation of the Constitution and the laws of the United States; that the defendants are threatening to continue to so conspire and to deprive the minor plaintiffs and members of their class of their constitutional rights; that the minor plaintiffs, through their legal representatives, have petitioned the defendants to cease and desist from further unlawful discrimination against the minor plaintiffs.

The prayer of the complaint is that the court enter a decree declaring and defining the legal rights and relations of the parties in the subject matter in controversy; that a permanent injunction be issued enjoining and restraining the individual defendants and their successors in office, and the defendant District, its agents, servants, employees, attorneys, and their successors in office, from executing or enforcing against the minor plaintiffs, or any member of the class of persons they represent, any constitutional provision, statute, or ordinance of the State of Arkansas, or any rule or regulation made or issued by any administrative agency, board, or commission of the State of Arkansas, that permit, require, or sanction the separation or segregation of minor plaintiffs or any member of the class of persons that they represent in the use and enjoyment of any public school building, land, facility, privilege, or opportunity within the State of Arkansas, and particularly within the defendant District, or any public free school that is under the supervision or control of the defendants or any of them on the basis or classification of race or color.

On February 29, 1956, the defendants filed their answer to the complaint, and by their answer eliminated many of the allegations contained in the complaint. They alleged "that no State statute, no provision of the constitution of the State of Arkansas, and no rule or regulation promulgated by an administrative board of the State of Arkansas made pursuant to, or in purported reliance upon, a State statute or a State constitutional provision is involved herein * * * that they do not now rely, and have not since May 17, 1954, the date of the decision of the Supreme Court of the United States, in the case of Brown v. Board of Education, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873], relied upon any State statute or State constitutional provision as authorizing segregation of the races in the public schools".

They denied that they have acted or purported to act since May 17, 1954, under any law of the State of Arkansas providing for schools on a separate and segregated basis because of race or color, or that they acted under the laws of the State of Arkansas in denying and refusing the minor plaintiffs, and the class they represent, the right and privilege of registration, enrolling, entering and attending classes and receiving instruction in the public schools operated by the defendant District.

Defendants alleged that since May 17, 1954, they have regarded as invalid the statutory provisions cited and set forth in the complaint of the plaintiffs, and that they do not rely upon said provisions in the plan they have adopted and propose for integration. The defendants also denied that they had conspired in any manner, or were then or now conspiring, to deprive the plaintiffs and the members of the class they represent of their rights and privileges and immuni-

ties as citizens of the United States and of the State of Arkansas, by providing and maintaining separate and segregated schools contrary to and in violation of the Constitution of the United States.

The defendants admitted that the adult plaintiffs "have met with defendants and have requested immediate integration, and that they have tendered their minor children to Central High School, Technical High School, Forest Heights Junior High School, and Forest Park Elementary School", all of which are within the defendant District, and that such schools are next most proximate to the residences of the adult plaintiffs.

Defendants further answering alleged that soon after the decision of the Supreme Court was handed down on May 17, 1954, they issued to the public press a statement setting forth their attitudes as to integration, and that later the defendants prepared a Plan of Integration. A copy of the public statement and a copy of the Plan of Integration are attached to the answer and made a part thereof.

"The defendants are now in good faith endeavoring to integrate the schools of the Little Rock School District in accordance with the terms and conditions and the time schedule as set forth in said Plan. The said Plan and the reasons which make it appropriate, reasonable, and necessary in this particular locality have been explained to the adult plaintiffs and to all others who have sought information from defendants."

The defendants then alleged that the Plan is peculiarly fit and suitable for the defendant District, and will best serve the educational needs of both races, and the personal interest of the plaintiffs in being admitted to the public schools as soon as practicable on a nondiscriminatory basis; that the plaintiffs unreasonably insist on a hasty integration which will be unwise, unworkable, and fraught with danger; that would prove detrimental to the personal interest of plaintiffs and the educational needs of both races, and would unnecessarily and inevitably hinder and retard the accomplishment of integration of the schools of the defendant District.

Thus, under the pleadings in this case there is no constitutional question involved. The defendants freely recognize their obligation to provide as soon as reasonably practicable integration in the defendant District. The primary, if not the only, question before the court is, to use the words of the Supreme Court, "the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system." [349 U.S. 294, 75 S.Ct. 756]

There is no dispute between the parties as to the facts. They are as follows:

(1) The adult petitioners and minor plaintiffs are each citizens and residents of the City of Little Rock, Pulaski County, Arkansas, and are each members of the Negro race. The defendants are the Little Rock School District, its Board of Directors and its Superintendent. This is a class action by plaintiffs seeking integration of public schools in the Little Rock School District.

(2) The Little Rock School District contains 32.9 square miles. It was created in 1870 and since its inception the various schools in the District have been operated on a segregated basis.

On May 20, 1954 (three days after the Supreme Court rendered its decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873) the Little Rock School Board adopted a statement concerning "Supreme Court Decision—Segregation in Public Schools." This statement was released for publication on May 23, 1954, and, inter alia, it provided:

"* * * Until the Supreme Court of the United States makes its decision of May 17, 1954 more specific, Little Rock School District will continue with its present program.

"It is our responsibility to comply with Federal Constitutional Requirements and we intend to do so

when the Supreme Court of the United States outlines the method to be followed.

"During this interim period we shall do the following:

"1. Develop school attendance areas consistent with the location of white and colored pupils with respect to present and future physical facilities in Little Rock School District.

"2. Make the necessary revisions in all types of pupil records in order that the transition to an integrated school system may serve the best interests of the entire school district.

"3. Make research studies needed for the implementation of a sound school program on an integrated basis. * * *"

(3) The School Board instructed the Superintendent, the defendant, Virgil Blossom, to prepare a plan for the integration of the schools in the Little Rock School District. Such a plan was prepared and approved by the Board on May 24, 1955 (seven days prior to the supplemental opinion of the Supreme Court in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083). The plan is as follows:

"Little Rock Board of Education
"Plan of School Integration—
Little Rock School District

"The Supreme Court decision of May 17, 1954, which declared segregated schools unconstitutional has placed before us the most difficult educational problem of our time. A careful analysis of the following has been made.

"1. Financial ability of Little Rock School District to integrate its schools.

"2. Adequacy of present school facilities plus those to be added from $4,000,000.00 bond issue of March, 1953, plus the amount of money to be realized from the sale of the 'old Peabody School Site' on West Capitol Ave.

"3. Proper time and method for the integration of the schools of Little Rock School District *in a manner consistent with the law as finally interpreted by the Supreme Court and acceptable to both races.*

"Our review of the three questions raised, reveal the following facts and opinions.

"1. Integration of its schools by Little Rock School District will probably place *no serious additional* financial burden on the School District.

"2. The facilities of Little Rock School District will be inadequate at the junior and senior high school levels until such time as the three senior high schools and six junior high schools are ready for occupancy.

"3. It is our opinion that the proper time for, and method of integration is as follows:

"A. *Time of Integration*

"Integration of schools in Little Rock School District *cannot be accomplished until completion of the needed school facilities* (three senior high schools and six junior high schools) *and specific decrees have been formulated by the U. S. Supreme Court in the pending cases.*

"B. *Method of Integration*

"The method of changing from segregated to integrated schools should not be attempted simultaneously in grades one to twelve. Due to the complexity of this problem, an orderly systematically planned process should be followed. In Little Rock School District our research and study causes us to believe that the following plan charts the best course for all concerned.

"1. In our opinion integration should begin at the senior high school level. (Grades 10–12) *(First phase of program)*

"2. Following successful integration at the senior high school level, it should then be started in the

junior high schools. (Grades 7-9) *(Second phase of program)*

"3.. After successful integration in junior and senior high schools it should· be started in elementary schools. (Grades 1-6) *(Third phase of program)*

"*(Present indications are that the school year 1957-58 may be the first phase of this program.)*

"The Board of Education's reasons for the adoption of this plan of integration are as follows:

"1. Since our school system has been segregated from its beginning until the present time, the time required in the process as outlined should not be construed as unnecessary delay, but that which is justly needed with respect to the size and complexity of the job at hand.

"2. It is ill advised to begin this process with inadequate facilities.

"3. It is unwise to begin integration until the Supreme Court gives direction through its interpretation of the specific cases before it.

"4. By starting integration at the senior high school level the process will begin where fewer teachers and students are involved.

"5. In the adoption of a plan of integration ( (1) senior high school (2) junior high school (3) elementary schools) of sequential order, we provide the opportunity to benefit from our own experience as we move through each phase of this plan, thus avoiding as many mistakes as possible.

"6. The establishment of attendance areas at the elementary level (grades 1-6) is most difficult due to the large number of both students and buildings involved. Because of this fact it should be the last step in the process.

"We sincerely solicit your understanding and cooperation in the implementation of this plan, in order that the interests of all children may be better served.

"Little Rock Board of Education
"William G. Cooper, Jr., President
"Mrs. A. E. McLean, Vice President
"Mrs. Edgar Dixon, Secretary
"Dr. Edwin N. Barron
"Foster A. Vineyard
"R. A. Lile"

(4) Since the adoption of the plan, Mr. Blossom has read and explained the plan to approximately 125 to 150 groups in an effort to obtain public acceptance of its provisions and the resulting orderly integration of the schools.

Foremost among the problems of the Little Rock School District are those of finances, structural organization, enrollment, and the selection and training of an adequate staff. These problems are not new, but they will be greatly accentuated by integration. By its plan the School Board is seeking to integrate its schools and at the same time maintain or improve the quality of education available at these schools. Some of its objectives are to provide the best possible education that is economically feasible, to consider each child in the light of his individual ability and achievement, to foster sound promotion policies, to provide necessary flexibility in the school ·curriculum from one attendance area to another, to select, procure, and train an adequate school staff, to provide necessary in-service training for the school staff, to provide a necessary educational program for deviates (mentally retarded, physically handicapped, speech correction, etc.), to provide the opportunity for children to attend school in the attendance area where they reside, to foster sound administrative practices, to maintain extra-curricular activities, to attempt to provide information necessary for public understanding, acceptance and support, and to· provide a "teachable" group of children for each teacher. With regard to the latter objective, it is the policy of the Board to group children with enough homogeneity for efficient planning and classroom management.

(5) As of May, 1956, the number of Negro students in the Little Rock School

District was as follows: Grades 1–6, 3,303; Grades 7–9, 1,252; Grades 10–12, 929; or a total of 5,484.

The number of white students on the same date was as follows: Grades 1–6, 9,285; Grades 7–9, 3,831; Grades 10–12, 3,126; or a total of 16,242.

The Negro students had 118 teachers for grades 1–6; 42 teachers for grades 7–9; and 25 teachers for grades 10–12.

The white students had 294 teachers for grades 1–6; 145 teachers for grades 7–9; and 108 teachers for grades 10–12.

The pupil-teacher ratio for all students was approximately 26–1 in senior high and junior high, and 30–1 in grade school.

At the present time there are three high schools in the District. Central High School was built in 1926, is presently an all-white school, and will accommodate 2,500 to 2,600 students. Technical High School was built in 1944, is now an all-white school, and will accommodate 225 to 250 students. Horace Mann High School was built in 1956, is now an all-Negro school, and will accommodate 925 students. Construction has begun on the West End High School, which will accommodate 925 students and which should be completed about July 15, 1957.

The School Board intends to start integration at the high school level (grades 10–12) in the fall of 1957. In accord with this plan the Board has completely reorganized its attendance areas. At present Central and Technical High Schools have a city-wide attendance area for white students, and Horace Mann High School has a city-wide attendance area for Negro students. Under the new plan Technical High School would remain a city-wide school for all students, but Central and Horace Mann High Schools, together with the new West End High School, would each have separate attendance areas. At this time there are no Negro students residing in the West End High School attendance area, but there are both Negro and white students residing in the Central and Horace Mann High School districts.

There are now six junior high schools in the District, and another one will be needed in the near future.

(6) In preparing for integration school authorities have taken a number of steps, including the establishment of attendance areas, study of aptitudes of the children, starting of the in-service program for staff members, new promotion policies, program of information to members of the community, harmonizing student records, continuation of building program, administrative studies, and work on the guidance program.

(7) As stated in the plan and established by the evidence, the Board intends to start integration in the fall of 1957 at the high school level. The reason for starting at the high school level is that fewer students, teachers, buildings, etc., will be involved. The school authorities hope to be able to learn by experience and to be better able to enter the next phase of the plan.

The second phase of the integration plan would start two or three years after the first phase, i. e., in 1959 or 1960, and would include grades 7–9 (junior high).

The final phase of the plan would start two or three years after the start of the second phase, and would include grades 1–6. In other words, complete integration would be effected not later than 1963.

(8) The Superintendent, Mr. Blossom, along with all the other defendants and the staff of the defendant district, has worked diligently in a good faith effort to prepare and to effectuate a plan of integration that will be to the best interest of all parties and to the public.

Mr. Blossom is a highly qualified and experienced school administrator and has given much thought and study to the myriad problems relating to integration. He has had the cooperation of the Little Rock School Board in his effort to achieve integration without lowering the quality of education offered to all the school children.

It may be supererogation for the court to here review the two decisions of the

Supreme Court of the United States in which the rights of the plaintiffs are declared and the duties of the lower federal courts in a case such as the instant one are set forth, but, because of the intense public interest in the question now before the court, it seems advisable for the court to do so.

On December 9, 1952, four cases from the States of Kansas, South Carolina, Virginia, and Delaware were argued under the title of Brown v. Board of Education of Topeka. The cases were not immediately determined and were re-argued December 8, 1953, and were decided on May 17, 1954, one year, five months, and eight days after the first argument. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.

Following a factual outline of the cases, the Court at page 493 of 347 U.S., at page 691 of 74 S.Ct. said:

"We come then to the question presented: Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities?

We believe that it does."

In the opinion the Court considered the validity of the adoption of the Fourteenth Amendment to the Constitution of the United States in 1868, and inferentially held that the Amendment was validly adopted. The Court also reviewed the six cases that had been before it involving the " 'separate but equal' " doctrine in the field of public education, and at page 495 of 347 U.S., at page 692 of 74 S.Ct. said:

"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment."

Because of the great variety of local conditions in the school districts involved in those cases, the Court recognized that the formulation of a decree presented problems of considerable complexity, and the Court restored the cases to the docket and requested further argument on the form of decrees to be entered in the cases then immediately under consideration.

The cases were re-argued on April 11–14, 1955, on the question of the form of relief to be granted, and on May 31, 1955, the second and implementing opinion was rendered. Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 755, 99 L.Ed. 1083. In the latter opinion, speaking of the opinion handed down on May 17, 1954, the Court said:

"The opinions of that date, declaring the fundamental principle that racial discrimination in public education is unconstitutional, are incorporated herein by reference. All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle."

In the argument of April 11–14, 1955, the following questions, which the Court had propounded while it was considering its original opinion of May 17, 1954, were argued:

" '4. Assuming it is decided that segregation in public schools violates the Fourteenth Amendment

" '(a) would a decree necessarily follow providing that, within the limits set by normal geographic school districting, Negro children should forthwith be admitted to schools of their choice, or

" '(b) may this Court, in the exercise of its equity powers, permit an effective gradual adjustment to be brought about from existing segregated systems to a system not based on color distinctions?

" '5. On the assumption on which questions 4(a) and (b) are based, and assuming further that this Court will exercise its equity powers to the end described in question 4 (b),

" '(a) should this Court formulate detailed decrees in these cases;

" '(b) if so, what specific issues should the decrees reach;

" '(c) should this Court appoint a special master to hear evidence with a view to recommending specific terms for such decrees;

" '(d) should this Court remand to the courts of first instance with directions to frame decrees in these cases, and if so what general directions should the decrees of this Court include and what procedures should the courts of first instance follow in arriving at the specific terms of more detailed decrees?' "

The Court, in speaking of the arguments presented on the question of the type of relief, at page 299 of 349 U.S., at page 755 of 75 S.Ct. said:

"These presentations were informative and helpful to the Court in its consideration of the complexities arising from the transition to a system of public education freed of racial discrimination."

The Court recognized that the school authorities would encounter many and varied problems which would have to be determined by them. In this connection the Court at page 299 of 349 U.S., at page 756 of 75 S.Ct. said:

"Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further

hearings, the courts which originally heard these cases can best perform this judicial appraisal. Accordingly, we believe it appropriate to remand the cases to those courts."

The Court held that in fashioning and effectuating the decrees, the trial courts should be guided by equitable principles; that equity has always been characterized by practical flexibility in shaping its remedies and by facility for adjusting and reconciling public and private needs.

At page 300 of 349 U.S., at page 756 of 75 S.Ct. the Court said:

"At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them."

The Court held, 349 U.S. 300, 75 S.Ct. 756, that the school authorities should make "a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner." It emphasized that the burden would rest upon the school authorities to establish that additional time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date.

The Court then said that the trial "courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel,

revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases."

In the case of Briggs v. Elliott, 132 F. Supp. 776, 777, one of the original cases before the Supreme Court, the three-judge court sitting in the Eastern District of South Carolina, upon a remand of the case, said:

"It has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains. This, under the decision of the Supreme Court, the state may not do directly or indirectly; but if the schools which it maintains are open to children of all races, no violation of the Constitution is involved even though the children of different races voluntarily attend different schools, as they attend different churches. Nothing in the Constitution or in the decision of the Supreme Court takes away from the people freedom to choose the schools they attend. The Constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation. The Fourteenth Amendment is a limitation upon the exercise of power by the state or state agencies, not a limitation upon the freedom of individuals.

"The Supreme Court has pointed out that the solution of the problem in accord with its decisions is the primary responsibility of school authorities and that the function of the courts is to determine whether action of the school authorities constitutes 'good faith implementation of the governing constitutional principles'."

 Upon the request of the court, prior to the trial, the attorneys for the respective parties furnished the court citations of authorities upon which they were relying to support their respective contentions. The court has examined and read each of the authorities along with other decisions not cited by the attorneys. However, the decisions of the lower federal courts are of very little help, if any, in the solution of the question before the court. The primary responsibility for the implementation of the constitutional principles announced in the May 17, 1954, decision, Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873, is upon the school authorities. It is the duty of the school authorities to solve the many and varied local problems. Because of the nature of the problems and the local conditions the school authorities often find that action taken by other school districts is inapplicable to the facts with which they are dealing. It is not the duty or function of the federal courts to regulate or take over and operate the public schools. That is still the duty of the duly state-created school authorities, but the free public schools must be maintained and operated as a racially nondiscriminatory system. During the period of transition from a segregated to a nonsegregated system the school authorities must exercise good faith. They must consider the personal rights of all qualified persons to be admitted to the free public schools as

soon as practicable on a nondiscriminatory basis. The public interest must be considered along with all the facts and conditions prevalent in the school district. Educational standards should not be lowered. If the school authorities have acted and are proceeding in good faith, their actions should not be set aside by a court so long as their action is consistent with the ultimate establishment of a nondiscriminatory school system at the earliest practicable date.

The plaintiffs seek a decree declaring certain provisions of the Arkansas Constitution and statutes to be unconstitutional. These statutes and the constitutional provisions of Arkansas have been declared unconstitutional by the Supreme Court of the United States. Defendants admit that the State laws requiring segregation are unconstitutional and void. Plaintiffs also ask in their complaint that the rights of the parties and others similarly situated be declared. Here there is no controversy between the litigants as to their respective rights. Plaintiffs claim the right to be admitted to schools without discrimination because of race or color. The defendants freely admit that right. The only point at issue relates to the adequacy of the plan of defendants for the transition from a segregated to a nonsegregated school system.

Plaintiffs also seek an injunction to compel the defendants to admit them to all free public schools without discrimination because of race or color. The defendants have declared their readiness to admit plaintiffs and others similarly situated to the schools under their control and supervision on a nonracial basis as soon as practicable. Here the rights claimed by the plaintiffs are admitted, and thus there is no threat on the part of defendants to deny plaintiffs and others similarly situated any of their constitutional rights.

■ The history of equity jurisdiction is the history of regard for public consequences when a party seeks to employ the extraordinary remedy of injunction. Public interests have a high claim upon the discretion of a chancellor, and especially is this true under the facts in this case. Federal trial courts should exercise a sound discretion and use their authority only in exceptional cases, because of the scrupulous regard that the law has for the rightful independence of State authorities.

■ The federal trial courts should maintain, if possible, a harmonious relation between state and federal authority where the state authority, in this instance the Board of Directors, is proceeding in good faith to discharge its duties, and thus to establish within a reasonable period of time a nonracial system of schools as required by the supreme law of the land.

As said by United States Circuit Judge, Ben F. Cameron, of the Fifth Circuit in his dissenting opinion in Brown v. Rippy, 233 F.2d 796, 802:

"It is not reasonable that the Supreme Court would have placed primary responsibility in a group commissioned to act administratively with the expectation that this group would be hampered or vexed in accomplishing their task, severely difficult at best, by contemporaneous litigation directed towards fashioning a club to be held over their heads. Such a judicial intervention would connote a distrust of the functioning of the preliminary administrative process and would cast those conducting it under a handicap of suspicion so great as to thwart at the threshold the orderly carrying out of the procedures so plainly delineated by the Supreme Court."

■ Learned counsel for plaintiffs earnestly contended in their oral argument that the defendants had not made a prompt and reasonable start toward full compliance with the May 17, 1954, decision of the Supreme Court; that additional time should not be allowed the Board of Directors until and unless a reasonable start toward full compliance had been made, and that in this instance such a start had not been made by the

defendants. Ordinarily, the word "start" means a beginning of a journey or a course of action. It is the first motion from a place or condition; the place of beginning or point of departure. When the word is considered in context, it must be construed to embrace any necessary action taken by a Board of Directors which will, if consistently followed in good faith, lead to the admission to public schools of the plaintiffs and others similarly situated as soon as practicable on a nondiscriminatory basis. The objective cannot be obtained in an orderly manner until a variety of obstacles have been removed. The defendants are making every effort to remove those obstacles in this case, and the court thinks they have made a prompt and reasonable start toward full compliance with the requirements of the law.

The testimony of the defendant Superintendent of Schools, Mr. Virgil Blossom, is convincing that not only he but the other defendants have acted in the utmost good faith. Their sole objective has been, and is now, to faithfully and effectively inaugurate a school system in accordance with the law as declared by the Supreme Court. They are seeking and have been seeking ways and means of effectuating a transition from a segregated to a nondiscriminatory system without destroying the fundamental objectives of the system itself.

This court is of the opinion that it should not substitute its own judgment for that of the defendants. The plan which has been adopted after thorough and conscientious consideration of the many questions involved is a plan that will lead to an effective and gradual adjustment of the problem, and ultimately bring about a school system not based on color distinctions.

It would be an abuse of discretion for this court to fail to approve the plan or to interfere with its consummation so long as the defendants move in good faith, as they have done since immediately after the decision of May 17, 1954, to inaugurate and make effective a racially nondiscriminatory school system.

Therefore, an order should be entered approving the plan of the defendants as being adequate, and denying the prayer of the complaint of plaintiffs for a declaratory judgment and injunctive relief. The order should further provide that the court retain jurisdiction of this case for the entry of such other and further orders as may be necessary to obtain the effectuation of the plan as contemplated and set forth herein.[1]

---

1. The court is of the opinion that this order will be final and appealable, even though the court retains jurisdiction for the purpose of entering furtner orders.

See, Pioche Mines Consolidated, Inc., v. Fidelity-Philadelphia Trust Co., 9 Cir., 191 F.2d 399, 400; 13 Cyc. of Federal Procedure, Sec. 57.20, p. 126.