Samuel HILL et al., Plaintiffs,

v.

COUNTY BOARD OF EDUCATION OF FRANKLIN COUNTY, TENNESSEE, a public body corporate, et al., Defendants.

Civ. A. No. 668.

United States District Court
E. D. Tennessee,
Winchester Division.

June 23, 1964.

672

Looby & Williams, Nashville, Tenn., for plaintiffs.

Lynch & Lynch, Winchester, Tenn., for defendants.

NEESE, District Judge.

This is basically an action to reorganize the tax-supported public schools of Franklin County, Tennessee into a unified nonracial educational system. 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983. The plaintiffs are members of the Caucasian and Negro races, and the defendants are a governmental authority and individual authorities of the tax-supported public school system of Franklin County, Tennessee. The action is brought by the plaintiffs on behalf of themselves and others similarly situated. Hearings on several aspects of the action were conducted by the Court on August 21, September 27 and 30, and December 30 and 31, 1963.

The Franklin County educational system has traditionally deprived Negro children of rights secured to them by the Fourteenth Amendment of the Constitution of the United States. " * * * Cases involving desegregation, like other cases, depend largely on the facts. While the law has been stated * * * by the Supreme Court, nevertheless, its application depends upon the facts of each particular case. * * * '(T)he formulation of decrees in these cases presents problems of considerable complexity.' Brown v. Board of Education, 347 U.S. 483, 495 [74 S.Ct. 686, 692, 98 L.Ed. 873]. 'Full implementation of these constitutional principles * * * require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts * * consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. * * *

" 'In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.' Brown v. Board of Education, 349 U.S. 294, 299, 300 [75 S.Ct. 753, 765, 99 L.Ed. 1083]. * * * (A)t stake [is] the personal interest of the [minor] plaintiffs [and those similarly situated] in admission to the public schools as soon as possible on

a non-discriminatory basis. * * * (E)ffectuating this interest may call for elimination of a variety of obstacles in making the transition; * * * courts of equity may properly take into consideration the public interest in the elimination of such obstacles; * * * once a [proper] start is made, the courts may find that additional time is necessary to carry out the ruling in an effective manner.

" ' * * * (A) District Court, after analysis of the relevant factors (which, of course, *excludes* hostility to racial desegregation), [may] conclude that justification [exists] for not requiring the present nonsegregated admission of all qualified Negro children. In such circumstances, however, the Courts * * * scrutinize the program of the school authorities to make sure that they [have] developed arrangements pointed toward the earliest practical completion of desegregation, and [have] taken appropriate steps to put their program into effective operation. * * * (D)elay in any guise in order to deny the constitutional rights of Negro children [will] not be countenanced * * * only a prompt start, diligently and earnestly pursued, to eliminate racial segregation from the public schools [can] constitute good faith compliance.' Cooper v. Aaron, 358 U.S. 1, 7 [78 S.Ct. 1401, 1404, 3 L.Ed.2d 5].

* * * * * *

" ' "It has not been decided that the federal courts are to take over or regulate the public schools * * *. It has not been decided that the [local authorities] must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they [must] attend. What * * * has [been] decided, and all that * * * has [been] decided is that [local authorities] may not deny to any person on account of race the right to attend any school that [said local authorities] maintain. This, under the decision of the Supreme Court, * * * [local authorities] may not do directly or indirectly; but if the schools [they maintain] are open to children of all races, no violation of the Constitution is involved even though the children of different races voluntarily attend different schools, *as they attend different churches*.[1] Nothing in the Constitution or in the decision[s] of the Supreme Court takes away from the people freedom to choose the schools they attend. The Constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation." * * * Because of the nature of the problems and the local conditions, the school authorities often find that action taken by other school districts is inapplicable to the facts with which they are dealing. * * * [The] free public schools must be maintained and operated as a racially nondiscriminatory system. During the period of transition from a segregated to a nonsegregated system the school authorities must exercise good faith. They must consider the personal rights of all qualified persons to be admitted to the free public schools as soon as practicable on a nondiscriminatory basis. The public interest must be considered along with all the facts and conditions prevalent in the school district. Educational standards should not be lowered. If the school authorities have acted and are proceeding in good faith, their actions should not be set aside by a court so long as their action is consistent with the ultimate establishment of a nondiscriminatory school system at the earliest practicable date.' Aaron v. Cooper, D.C., 143 F.Supp. 855 at pages 864, 865." Kelley v. Board of Educ. of City of Nashville, etc., C.A. 6th (1959), 270 F.2d 209, 225–226.

Following extensive hearings on September 27 and 30, the Court ordered the defendants to submit a plan of complete reorganization of their school system on a unified, nonracial basis by October 31,

1. Emphasis supplied.

1963 and allowed the plaintiffs fifteen additional days in which to file objections. Such a plan was submitted on that date, and on November 13, 1963 the plaintiffs specified their objections to the plan. On December 11, 1963, the Court overruled respective motions by both sets of litigants for a summary judgment and set the matter for further hearing on the factors the defendants had considered in adopting the plan which they had submitted. All parties were further ordered to offer evidence and argument on the effect of the Court's portended ending, in the exercise of its injunctive powers, of segregation in the Kennerly and Sewanee Public Schools earlier than the defendants had proposed in their plan. Opportunity was accorded the defendants to show cause why such segregation could not be ended more quickly by the assignment, without consideration of race or color, of all students then enrolled in the first, sixth or other grade (or grades) in both of those schools, and the transfer, under the same considerations, of all other students then enrolled in Kennerly School to Sewanee Public School.

Following the hearings on December 30 and 31, 1963, the Court issued a preliminary injunction requiring the defendants to reorganize that part of the eighth school district of Franklin County, Tennessee, which was then served by Sewanee Public School and Kennerly School, so that the (then) present compulsory biracial aspects of those schools and supporting transportation facilities would assume single and nonracial aspects forthwith, and, no later than 8:30 a. m., Monday, March 2, 1964, the assignments or reassignments of students to such schools, to accomplish the purposes of the injunction, to be carried forward without regard to the race or color of the students involved. A further hearing was scheduled on that effective date.

The Court, after further hearing on March 2, 1964, ordered the defendants to adopt a plan of assignment or reassignment of students lately attending those schools on the basis of geographical zoning and the admission by March 12, 1964,

of students to the zoned facilities according to the students' respective places of residence. By stipulations of the parties litigant, this judgment was stayed, consecutively, to April 6 and 13 and August 24, 1964. By the latter date, it is anticipated that Sewanee Public School and Kennerly School will be completely consolidated, and all students in the affected area will attend one and the same school from and after the commencement of the 1964–1965 school term.

The defendants filed an amended and supplemental plan of desegregation of the remaining schools of Franklin County, Tennessee on April 14, 1964 (which did not include an important exhibit thereto); on April 24, 1964, the plaintiffs specified their objections thereto; and on May 19, 1964, the exhibit was supplied. The Court now has for adjudication the merits of the complete plan of the defendants.

Proceeding on the premise that this Court has the primary duty and responsibility of judicially appraising the program of the defendants, as if it were completely unique, the Court has been disturbed as to whether the defendants have evinced the diligence and earnest pursuit of their problems which would indicate their good faith compliance with the law. Their announced policy of compliance unabashedly expressed their " * * * intent to comply with the ultimate mandates of our courts * * * ", although they have been under the affirmative duty of initiating in good faith the desegregation of the public schools of Franklin County, Tennessee for a decade. Cooper v. Aaron, supra, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 10–11.

This assertion may be explained in some degree by the defendants' further assertion that the members of the defendant Board of Education had "considered" Brown v. Board of Education (1954), supra, " * * * the law of the case rather than the law of the land * * *." Even if the defendants had in fact proceeded on such an erroneous assumption initially, they were put on notice in 1956 that the principles laid down by the Su-

preme Court of the United States in the Brown case, supra, constituted the law of the land, and that it applied to all schools supported by public funds; because in that year the Tennessee Supreme Court so held. Roy v. Brittain (1956), 201 Tenn. 140, 297 S.W.2d 72. This Court will judicially notice some reluctance on the part of some local officers, sworn to uphold the law, to accept immediately declarations of the law by the highest court in this nation; but, in so doing, this Court must also judicially notice a well-nigh unanimous acceptance by Tennessee officials of such declarations by the highest court of Tennessee. Thus, even if it be conceded that the defendant Board members had no convincing notice ten years ago of the requirement of the law that all school children of Franklin County be accorded equal treatment in the expenditure of public funds for educational purposes, they certainly have been aware of the law on this subject for eight years.

 The defendants have repeatedly observed in this court also that, until the institution of this action, " * * * no specific demand or request for the specific desegregation of the educational system of Franklin County, Tennessee, had ever been made * * *." While this may serve to salve to some extent the individual consciences involved, public officials who have taken upon themselves oaths to uphold the law cannot completely escape the purport of their unlawful failure to perform their sworn duties on the excuse that no one has asked them to do it! It is the school authorities who have the burden of initiating desegregation, and Negro children cannot be required to apply to them for that to which they are entitled as a matter of right. Northcross v. Board of Education of City of Memphis, C.A. 6th (1962), 302 F.2d 818, 823[2].

And, even if the defendants did not recognize the heavy burden resting upon them before the problem became real and present, they should have done so when this Court, in preliminary proceedings, undertook to make it abundantly clear that they are " * * * duty bound to devote every effort toward initiating desegregation and bringing about the elimination of racial discrimination in the public school system. * * *" [of Franklin County, Tennessee]. Cooper v. Aaron, supra, 358 U.S. at page 7, 78 S.Ct. at page 1404, 3 L.Ed.2d at pages 10–11. The Court announced at the hearings held in September, 1963, that there was no reason presented why desegregation could not be accomplished in the Sewanee area much earlier than proposed by the plan of the defendants. Yet, it was necessary for the Court to require the defendants by injunction to accomplish such desegregation when they, themselves, might have achieved the same result voluntarily by diligence and earnest pursuit of the problem.

In attempting to respond to the Court's injunctive order, the defendants ignored their duty to zone geographically the two schools in the Sewanee area, according to the capacity and facilities of the Kennerly and Sewanee Public School buildings and to assign (or re-assign, as the respective situations might have proved to be), students to those facilities according to the respective residences of the students. After the Court had ordered such zoning in this manner, the defendants submitted an amended and supplemental plan which included no geographical zoning of this nature.

" * * * Minimal requirements for non-racial schools are geographic zoning, according to the capacity and facilities of the buildings and admission to a school according to residence as a matter of right. 'Obviously the maintenance of a dual system of attendance areas based on race offends the constitutional rights of the plaintiffs and others similarly situated and cannot be tolerated.' Jones v. School Board of City of Alexandria, Virginia, 278 F.2d 72, 76, C.A. 4." Northcross v. Board of Education of City of Memphis, supra, 302 F.2d at page 823 [1].

It is significant also that, despite the Court's order for geographic zoning in the Sewanee area, the defendants took

no affirmative steps (of which the Court is aware) to accomplish this zoning; but rather, devised, or acquiesced in the devising by the citizenry affected, of a plan to consolidate the Sewanee schools. If consolidation of the Sewanee schools was the preferred mode of solving this particular obstacle in making the transition from a segregated to a desegregated school system, the defendants could, and should, have elucidated, assessed and solved this phase of the problem themselves with no prodding by the Court. As it was, the defendants apparently intended to take no action at all until the Court compelled it by granting the plaintiffs injunctive relief. This development contributed but sparsely to the defendants' reputation with this Court for good faith in the premises. The Court's experience with the defendants to this point in such matters suggests a continuation of their initially-announced policy of adamant obstinacy. The statement of their policy of compliance in this aspect was not amended when their amended and supplementary plan was submitted to the Court; thus, the Court must conclude that such policy is the same today as it was on October 31, 1963, despite all that has transpired in the interim.

■ This Court is under the duty of requiring the defendants to make " * * a prompt and reasonable start toward full compliance * * * " with the law and to take such action as may be indicated to accomplish the end of racial segregation in the public schools of Franklin County, Tennessee " * * * with all deliberate speed * * *." If the defendants properly discharge their functions, this Court's function will be limited to a judicial assessment of the defendant's program in the light of legal requirements. In any event, however, this Court will not hesitate to employ whatever measures appear to be best calculated to instill justice into the field of public education in Franklin County, Tennessee. The Court, frankly, is impatient with all attempts by the individual defendants to ascertain how little they must retreat from their announced

policy without jeopardizing judicial approval of their program.

■ Contemporaneously, this Court applauds that portion of the defendants' policy of compliance which declares that they will " * * * exhaust every means of communication and elucidation to prepare the citizenry of * * * " the County for the changes with which all its citizens will be confronted " * * * to the end that the community as a whole will accept [the amended plan of desegregation] with a view toward the continued maintenance and improvement of the county's educational program. * * * " The establishment of justice is a fundamental purpose of our government. The plaintiffs are entitled to a fulfillment of this governmental function. Equally important, however, is the maintenance of domestic tranquility, which is equated with the establishment of justice as a basic purpose of our national government. See, Constitution of the United States, Preamble.

■ This Court cannot consider hostility to racial desegregation in approving or disapproving the desegregation program of the defendants. Cooper v. Aaron, supra, 358 U.S. at page 6, 78, S.Ct. at page 1403, 3 L.Ed.2d at page 10. The defendants, however, may consider the public interest along with all the facts and conditions prevalent in Franklin County, Tennessee in deciding how best to resolve the delicate problems involved in the desegregation process. Aaron v. Cooper, D.C.Ark. (1956), supra, 143 F.Supp. at page 865 [1–4]. This Court is of the opinion that those charged with the responsibility of altering long-established customs do well to undertake to inspire in the affected citizenry the ultimate importance to all of equal justice under the rule of law.

The Court is of the view that public opinion can be, and sometimes has been, moulded by a small percentage of the natural leaders of a community; and that the domestic tranquility is more apt to be maintained where decisions as to future public conduct are made in advance of the institution of programs in-

volving radical changes in mores and customs. Improvements in biracial relations in areas where the races are more nearly in equipoise have borne a direct relation to the aptness of the leadership responsible for the consequences of change. In this field of vital concern, the defendants have evinced a high degree of responsibility in their policy declaration.

It is no wonder that uneasiness accompanies the necessity of the novel association of children of tender years of the Caucasian and Negro races in the public schools when their elders continue to worship God in biracial religious systems. So, while the defendants and the Court are concerned with the legal problems involved, the community is confronted with the moral, as well as the legal, connotations in inter-race relations. It is understandably difficult for the school authorities to teach that the law is no respecter of persons while simultaneously churches are derelict in teaching that God is no respecter of persons. A weird paradox is presented when, in locales approximating "Bible-belt country", the moral advance lags so far behind the forward progress of the law. These truths emphasize the modicum of good faith which the defendants promise will accompany the discharge of their official functions in this respect.

This is but a partial background for the Court's assessment of the defendants' desegregation plan. The plan submitted appears to be unique, in that it approaches the problem from a "horizontal" rather than the usual "vertical" posture. Instead of desegregating the Franklin County, Tennessee school children on a grade-year basis, the defendants plan such desegregation by geographical areas. This is proposed to be achieved by starting in the 1964–1965 term with Area VIII where Cowan Public School, with approximately 420 students of the Caucasian race, and Thorogood School,

with approximately 84 students of the Negro race, are located[2] and proceeding counter-clockwise on the county map through Areas III and IV in the 1965–1966 term, Area V in the 1966–1967 term, and Area VI in the 1967–1968 term.

Desegregation of Areas II, VII and I is postponed until the beginning of the 1968–1969 school term. Included in these three areas are the three high schools of the County. The school population in these three areas aggregates about 3,000 children of the Caucasian race and about 400 children of the Negro race.

The situation most impressed on the mind of the Court during the hearings in this action is the utter inadequacy of the public educational system of Franklin County, Tennessee. No witness disputed the assertions made that the County's school building facilities have lagged behind the normal increase in the school population. 'Squire Houston Vansant, chairman of the Franklin County Quarterly Court's finance committee for many years, testified that funds necessary to improve the physical facilities of the educational system cannot be made available to the defendants " * * * for five years * * * ", because Franklin County, Tennessee has too nearly approximated the maximum limit of bonded indebtedness permitted by Tennessee law. A member of the Franklin County Board of Education (and a defendant herein), Mr. Howard Garner, testified that the defendants have under active consideration with the finance committee of the Franklin County Quarterly Court plans to modernize the county school plants. Included in the planning is a new system of junior high schools. These plans are expected to be presented to the Quarterly Court at its session in July, 1964. According to the defendant Mr. Lewis Scott, superintendent of Franklin County schools, courses of study are not offered in schools where there is " * * * not

---

**2.** Sewanee Public School and Kennerly School in Area VIII will be consolidated and operated as a unified, biracial institution commencing with the 1964–1965 school term.

enough demand * * *." No effort seems to have been made to stimulate interest in certain crucial courses nor to consolidate at one school students from different schools who express interest in a course not offered in the particular school they, respectively, attend. Of the three high schools in the County, only Franklin County High School has been accorded a top-grade rating.

It is the opinion of the Court that the defendants, although belatedly, have now commenced solution of the school problems of Franklin County, Tennessee, and that additional time is necessary to eliminate the obstacles with which they are confronted in making the transition from an inadequate to an adequate system, as well as from a segregated to a desegregated system. Until the meeting in July, 1964 of the Franklin County Quarterly Court, which authorizes appropriations for educational purposes and fixes the tax rate for the new fiscal year, this Court will be unable to ascertain whether the defendants have taken appropriate steps to put their program into effective operation. Inaction or incomplete action on that occasion may be considered by the Court as a guise in order to deny Negro children their constitutional rights.

That the County is not discharging its governmental functions completely in the educational field is demonstrated by developments in the Sewanee area. Only after the issuance of the injunction requiring the defendants to assign and reassign Sewanee area students to the two bi-racial schools on a residence basis, was public complaint voiced over the startling inadequacy of the (then all Negro) Kennerly School.

It was proposed by an alarmed segment of citizens that the better facilities at Sewanee Public School be enlarged, and the students from both schools be consolidated at the latter (then all Caucasian) institution. Franklin County was either unable or unwilling to make the expenditure, however; and, it was thereupon necessary for a Sewanee civic organization to solicit and obtain funds for such purpose. Citizens of other areas of Franklin County have not taken similar private action, however.

■ To order total desegregation of these schools at a time when plans are in process to improve the educational system of the County would, in the Court's opinion, risk a further lowering of educational standards for all the school children and potential school children of the County. A major goal in the continued improvement of relations among the races of our nation is the better education of all. Certainly, " * * * (e)ducational standards should not be lowered. If the school authorities * * * are proceeding in good faith, their actions should not be set aside by a court so long as their action is consistent with the ultimate establishment of a nondiscriminatory school system at the earliest practicable date. * * *" Aaron v. Cooper, supra, 143 F.Supp. at page 865.

■ It is true that " * * * 'good faith compliance at the earliest practicable date' and [in] 'all deliberate speed.' * * *" with these defendants' duty to desegregate these public schools contemplates a shorter period now than was contemplated ten years ago. Goss v. Board of Education (1963), 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632, 636 (headnote 5); cf. Watson v. City of Memphis (1963), 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529, 533 (headnotes 1, 2). It is likewise true that in carrying out a desegregation plan, " * * * some individual rights will have to be subordinated for the good of many. * * *" Maxwell v. County Board of Education of Davidson County, Tenn., C.A. 6th (1962), 301 F.2d 828, 829 [1].

■ " * * * Because of the nature of the problems and local conditions the school authorities [have found] that action taken by other school [authorities] is inapplicable to the facts with which they are dealing * * *" here. Aaron v. Cooper, supra. The Court believes that, under all the circumstances, the defendants have decided lawfully and well to upgrade the whole educational system of Franklin County, Tennessee and con-

currently to completely eliminate racial discrimination in this public school system over a five-year period.[3] Certain details of the defendant's plan are unlawful and will be modified by the Court, *infra*. The greater complexity is whether additional time is needed to effectuate desegregation of the Franklin County schools outside of Areas I, II, and VII.

 It is evident that the defendants are concerned sincerely that the transition be made smoothly. They have, from the beginning, advanced plans to " * * * prepare the citizenry of * * the County for the changes with which all its citizens will be confronted * * * to the end that the community as a whole will accept [their amended plan of desegregation] with a view toward the continued maintenance and improvement of the county's educational program. * * " They are located geographically just north of, and contiguous to, a jurisdiction wherein the Chief Executive has openly and officially defied desegregation of educational institutions and gained nationwide support of such actions through political channels. Hostility to racial desegregation is a factor which is irrelevant to their task. Cooper v. Aaron, supra, 358 U.S. at page 7, 78 S.Ct. at page 1404, 3 L.Ed.2d at page 10, and they are not surrendering to the judicially noticed presence of hostility. But, as more than one of the defense witnesses testified, Franklin County is a geographically large rural county with a small law enforcement corps. The defendants contend that they can prevent any serious violent reactions to their program by preventative educational processes. In the interest of domestic tranquility, this Court believes their sincere concern should be honored. This is in the interest of all citizens; therefore, it is in the public interest, or so this Court believes. As the difference between delay due to hostility and delay to allay hostility is indistinct, the Court will be sensitive to any overlapping between the two.

 Therefore, the clerk is directed to enter forthwith as the order of this Court, the following:

The amended and supplemental plan of desegregation of the defendants, filed on April 14, 1964, hereby is modified as follows:

(1) The defendants will file with this Court, within twenty (20) days from the entry of this order, a further supplement to Item II (2) of the plan incorporating these factors:

(a) Each existing school facility will be zoned according to its capacity and facilities within each of Areas VIII (including the consolidated school at Sewanee), III, IV, V, VI and VII and the capacities and facilities of every other respective existing school facility within the respective Areas.

(b) All students of elementary school age residing within the respective zones of Area VIII on August 24, 1964 will be admitted on that date to the school within their respective zone, regardless of race or previous school attended.

(c) All students of elementary school age residing within the respective zones of Areas III and IV on the first day of the 1965–1966 school term will be admitted to the school within their respective zones, regardless of race or previous school attended, as of the date such term commences.

(d) All students of elementary school age residing within the respective zones of Area V on the first day of the 1966–1967 school term will be admitted to the school within their respective zones, regardless of race or previous school attended, as of the date such term commences.

(e) All students of elementary school age residing within the respective zones of Area VI on the first day of the 1967–1968 school term will be admitted to the school within their respective zones, regardless of race or previous school attended, as of the date such term commences.

---

3. This is well below the total time utilized in earlier actions which were judicially approved.

(f) All students residing within Areas IV, V, VI, VII and VIII who were eligible to attend a high school in Franklin County, Tennessee in the 1963–1964 term will be readmitted to the high school they, respectively, last attended; and all such students who become eligible to attend such a high school in the 1964–1965 school term will be admitted to the high school they, respectively, would have been eligible otherwise to have attended in the 1963–1964 school term.

(2) (a) No later than January 1, 1968, each junior high and high school facility then existing, or to become operational at the commencement of the 1968–1969 school term, will be zoned according to its capacity and facilities and the capacities and facilities of all other comparable schools in the County; and all students residing within the respective zones on the first day of the 1968–1969 school term will be admitted to such school within their respective zones, regardless of race or previous school attended, as of the date such term commences.

(b) No later than January 1, 1968, each existing elementary school facility in Areas I, II and VII will be zoned according to its capacity and facilities and the capacities and facilities of every other comparable school facility within said Areas; and all students of elementary school age residing within the respective zones of said Areas and eligible to attend such schools on the first day of the 1968–1969 school term, will be admitted to the school within their respective zones, regardless of race or previous school attended, on the first day of that term.

(3) Item II (4) of the plan is amended and supplemented by striking therefrom the semi-colon and all the language following the semi-colon and substituting in lieu thereof:

, as modified by the Court; provided that transportation to and from schools will be furnished all Negro children required to attend segregated institutions during the period of transition set forth in this plan; and provided further that all buses transporting any child to and from a desegregated school will be desegregated for the entire length of its route in so doing.

(4) Item II (5) of the plan is amended and supplemented by striking therefrom the period and substituting in lieu thereof the following:

All students residing within the respective zones of the respective Areas on the first day of the pertinent school terms will, as each respective Area is desegregated, be automatically assigned or re-assigned (as the case may prove to be) to the school within their respective zones, as of the date such term commences. No student will otherwise be transferred from one school to another school within the County, except for good cause shown. The unavailability of a course in which a student wishes to enroll, and for which course such student is eligible under established academic standards, shall be deemed good cause for transfer and reassignment to another school within the County where such desired course is offered to eligible students. Every transfer and reassignment of every student after August 24, 1964 shall be reported by the defendants to the clerk of the United States District Court for the Eastern District of Tennessee, Winchester Division, United States Courthouse, Greenville, Tennessee, by United States mail; except that the automatic transfers, assignments and reassignments hereunder need not be so reported.

(6) Item II of the plan is further supplemented by the addition of the following new subsection:

6. Forthwith, teachers, principals and other school personnel will be employed and assigned without regard to race or color, and in-service training and other activities involving teachers shall be conducted on a nonracial basis.

All other matters are reserved.