**John AARON et al., Plaintiffs,**

v.

**Everett TUCKER, Jr., et al., Defendants.**

**Civ. A. No. 3113.**

United States District Court
E. D. Arkansas, W. D.
Sept. 2, 1960.

Thurgood Marshall, James M. Nabrit, III, New York City, and Wiley A. Branton, Pine Bluff, Ark., for plaintiffs.

Mehaffy, Smith & Williams (by Herschel H. Friday, Jr., and Robert V. Light), and Howard Cockrill, Little Rock, Ark., for defendants.

JOHN E. MILLER, District Judge, sitting by assignment.

This is another of the many controversies that have stemmed from the judgment of this court approving a plan for desegregation of the Little Rock, Arkansas, public schools on August 27,

1956. Aaron et al. v. Cooper et al., D.C. E.D.Ark., 143 F.Supp. 855.[1]

On August 8, 1959, the plaintiffs, for themselves and all other members of the class whom they claim to represent, filed their motion for further relief in which it was alleged that Thelma Mothershed and Melba Pattillo are two of the nine Negro students who were admitted to and attended Central High School in Little Rock during the 1957–58 school term; that in July 1959 they registered at Central High School with other students who lived in the Central High School attendance zone; that on or about August 3, 1959, they were notified that they would not be admitted to Central High School during the 1959–60 school term, and that they would be assigned to attend the Horace Mann High School, which is a racially segregated school maintained by defendants for Negro pupils.

On August 21, 1959, the defendants filed a response to the motion of plaintiffs for further relief, in which they alleged:

"(1) Immediately after the decision of the Three Judge Court in this action holding Act 4 of the Second Extraordinary Session of the General Assembly for the year 1958 unconstitutional and void, the defendants, in accordance with and as commanded by existing court orders, assumed full control and operation of all the public schools of the District. As specified by the applicable Pupil Assignment Laws of the State of Arkansas, the Board of Directors adopted Assignment Regulations, a copy of which is attached hereto and made a part hereof,[2] and

---

1. A full and complete summary of the proceedings prior to January 9, 1959, is set forth in Aaron et al. v. Cooper et al., D.C., 169 F.Supp. 325–327.

Inter alia, it was provided in the order appearing in 169 F.Supp. 325–327, that the Board of Directors were allowed 30 days in which to submit a specific and detailed report of the affirmative steps they had taken and proposed to take in compliance with the order. The court retained jurisdiction.

In due time the then Directors filed their report, and on February 4, 1959, a hearing was held on the report which was approved over the objections of the plaintiffs and also the objections of the United States.

Subsequent thereto, Aaron et al. v. McKinley et al., D.C., 173 F.Supp. 944, was decided by a three-judge court. In that case the court on June 18, 1959, held unconstitutional Acts 4 and 5 referred to therein as the Acts of the General Assembly of the State of Arkansas, under which the high schools in Little Rock were closed. On December 14, 1959, the jugment of the three-judge court was affirmed by the Supreme Court of the United States, Faubus v. Aaron, 361 U.S. 197, 80 S.Ct. 291, 4 L.Ed.2d 237.

2. "Regulations of the Little Rock School District for the Assignment of Pupils, for the Re-Assignment of Pupils, and for the Processing and Hearing of Applications for Re-Assignment of Pupils

"I.
"Assignment on Original Admission.

"Requests for original admission to the Little Rock School District Public Schools shall be made on forms approved and provided by the Board of Directors (in these regulations called the 'Board'). Such requests shall be fully completed as to all information requested therein. The Superintendent of Schools shall submit to the Board his recommendation as to the assignment of such child. Thereafter, the Board shall .assign such child to a school in the District and shall notify the parents in writing of the assignment, which notice shall be delivered to the parents or mailed to them at the address set forth on the request for original admission.

"II.
Assignment of Students in School System.

"(a) The following assignments and procedure shall be applicable for the school year 1959–1960:

"(1) Each child enrolled in grades 1, 2, 3, 4, 5, 7, 8, and each child in grades 6 and 9 who was not promoted, in the schools of this District at the close of the school year 1958–59 is hereby assigned to the school designated on such child's Progress Report Card, as reflected by the Progress Report Card delivered to the child at the close of the 1958–59 school year· and as reflected by the official records of the School District in the Administration Office at 8th and Lou-

undertook the assignment procedure set forth therein and in the applica-

isiana. No additional notice shall be given of the assignments hereby made and any interested child or parent may make inquiry at the office of the Superintendent in the Administration Office at 8th and Louisiana.

"(2) Each child enrolled in grade 6 of the schools of this District at the close of the school year 1958–1959 who was promoted to the Junior High School level is hereby assigned to the Junior High School designated on the official records of the School District pertaining to such child on file in the Administration Office at 8th and Louisiana. No additional notice shall be given of the assignments hereby made and any interested child or parent may make inquiry at the office of the Superintendent in the Administration Office at 8th and Louisiana if there is any doubt as to the assignment of any child.

"(3) The Superintendent of Schools shall submit to the Board his recommendation as to the assignment of each child at the High School level (grades 10, 11 and 12). Thereafter, the Board shall assign each such child to one of the High Schools in the District and shall notify the parents of each child in writing of the assignment, which notice shall be mailed to them at the address reflected by the official records of the District.

"(b) The following procedure shall be applicable for each school year after the 1959–1960 school year:

"(1) During the month of May of each year, the Superintendent of Schools shall submit to the Board his recommendations as to the assignments for the next school year of each child enrolled in the schools of the District. Thereafter, but prior to the close of the school year then in progress, the Board shall assign each child in the schools of the District to a school for the next school year. Notice of the assignment shall be given by noting of the same on each child's Progress Report Card which is delivered to the child at the close of the school year then in progress. If, for any reason, a child does not receive a Progress Report Card, written notice of the assignment shall be mailed to the parents of such child at the address reflected by the official records of the District.

"III.
"Objections to Assignment and Requests for Re-Assignment or Transfer of Students.

ble laws, all within the framework of existing court orders. All stu-

"(a) Parents who desire to object to the assignment of a child to a particular school, or who desire re-assignment or transfer to a designated school or to another school to be designated by the Board, must file written application with the Board within ten (10) days from the date of the giving of the notice of assignment. The date of the giving of the notice of assignment shall be the date of the publication of these regulations in the case of assignments made hereby, or the date of the delivery of the Progress Report Cards to the children in the case of assignments noted thereon, or the date of the mailing of notice to parents in the case of all other assignments. If the tenth day falls on Saturday, Sunday or a holiday, the period for filing application shall extend to the next day that is not Saturday, Sunday or a holiday. Filing with the Board shall mean actual delivery to the Superintendent of Schools, or his authorized agent, at the Administration Office, 8th and Louisiana, during regular office hours.

"(b) Such applications objecting to the assignment or requesting re-assignment or transfer must be made on forms approved and provided by the Board. The application forms are available during regular office hours at the office of the Superintendent of Schools and, when open, at the several offices of the principals of the schools. Each application, completely executed as to all information requested thereby, must be personally signed by the parents of the child and must be verified before an officer authorized to administer oaths.

"(c) Upon receipt of any such application, the Board shall set a date for a hearing before the Board beginning within thirty (30) days from the filing of the application. The parents and the child must appear in person at the hearing but, in addition to their personal appearance, may have such representation as the parents and child desire. The parents shall be given at least seven (7) days' notice of the time, date and place of the hearing, which notice shall be mailed to them at their address reflected on the official records of the District in the Administration Office. The hearing of each application shall be confined to the particular application and shall be held separate and apart from a hearing on any other application.

"(d) The Board shall hear and consider all witnesses appearing before the Board and having information pertinent

·dents have been given their initial assignments, the high schools are open and are being operated on a non-discriminatory basis, and the

and relevant to the application and shall consider all relevant documentary evidence presented. In addition to hearing such evidence relevant to the individual child as may be presented on behalf of the applicant at the hearing, the board will conduct such investigations as it may deem necessary and may require such child, upon reasonable notice, to submit to interviews by agents or representatives of the Board, professional or otherwise, and to take oral, written, and/or physical examinations.

"(e) As promptly as possible after the hearing, the Board shall take final action on each application and the findings and conclusions of the Board shall be made a part of the official records of the Board. The parents of the child shall be notified promptly by mail of the final action of the Board. If dissatisfied with the final action of the Board, the parents of the applicant may file in writing an exception to the final action of the Board as constituting a denial of a right of such child guaranteed under the Constitution of the United States or of a right under the laws of the State of Arkansas, and the Board shall act promptly on such exception, and in any event within fifteen (15) days after the filing thereof. . The exception shall be filed on forms approved and provided by the Board, which forms may be obtained at the office of the Superintendent of Schools and, when open, at the several offices of the principals of the schools. Filing with the Board shall mean actual delivery to the Superintendent of Schools, or his authorized agent, at the Administration Office, 8th and Louisiana, during regular office hours.

"(f) Each child shall attend the school to which he or she is originally assigned until the Board reassigns the child to another school.

"IV.

"Power of Board to Change Assignment.

"Anything in these regulations to the contrary notwithstanding, the Board reserves the right to change the assignment of any child at any time when, in the opinion of the Board,. the factors listed hereinafter in Article V, or any other relevant factor, require such change. Provided, however, that in each case of such change of assignment, and within the time prescribed in these regulations after due notice of the change of assignment, the parents of the child may make application setting forth objections to the assignment or requesting re-assignment or transfer, and the procedure prescribed hereinabove for the processing of such applications shall be followed.

"V.

"Standards and Criteria.

"In making original assignments or in considering applications setting forth objections to assignments or requesting reassignment or transfer, the Board shall consider all relevant matters pertaining to the best interest of the children, the efficient operation of the schools, and the efficient carrying out of the best possible educational program, including, but not necessarily limited to:

"1. Available room and teaching capacity in the various schools;

"2. Availability of transportation facilities;

"3. The effect of the admission of new pupils upon established or proposed academic programs;

"4. The suitability of established curricula for particular pupils;

"5. The adequacy of the pupil's academic preparation for admission to a particular school and curriculum;

"6. The scholastic aptitude and relative intelligence or mental energy or ability of the pupil;

"7. The psychological qualifications of the pupil for the type of teaching and associations involved;

"8. The effect of admission of the pupil upon the academic progress of other students in a particular school or facility thereof;

"9. The effect of admission upon prevailing academic standards at a particular school;

"10. The psychological effect upon the pupil of attendance at a particular school;

"11. The possibility of breaches of the peace or ill will or economic retaliation within the community;

"12. The home ,environment of the pupil;

"13. The maintenance or severance of established and psychological relationships with other pupils and with teachers;

"14. The choice and interests of the pupil;

"15. The morals, conduct, health and personal standards of the pupil;

"16. The request or consent of parents or guardians and the reasons assigned therefor.

Board of Directors is now engaged in processing all applications for reassignments. These applications are being and will be processed expeditiously and action taken thereon in good faith and on a non-discriminatory basis. The administrative procedure has not been completed.

"(2) Thelma Mothershed and Melba Pattillo were initially assigned to Horace Mann High School and each has filed application for reassignment to Central High School. These applications are pending, and if and as long as each pursues her administrative remedies in compliance with the regulations of the Board, the Board will process the applications in good faith and in a non-discriminatory manner. The same procedure will be followed as to any student who so acts. In particular, these plaintiffs have not exhausted their administrative remedies.

"(3) The assignment and reassignment of each student is necessarily handled and to be handled on an individual basis and the class proceeding attempted by plaintiffs in this motion is improper. A court pro-

ceeding could be proper only after all administrative remedies are exhausted and only on an individual basis.

"(4) Since the public schools, under applicable law and court orders, are to be, and must be, operated by the School Boards, and not by the courts, no student can acquire a vested right to attend any particular school any more than he or she can acquire a vested right to receive, regardless of ability, progress and attitude, a particular grade. The circumstances, facts and factors governing assignments, of which residence proximity is only one of many, and education, many of which change from time to time, necessarily require flexibility and an area of conscientious discretion on the part of the Board. Only in this way can the best interests of the educational system, the public and the children be served. Thus, none of the plaintiffs, or any other student, has been granted by court order or has acquired any vested right to attend any particular school.

"(5) The existing court orders have only called for desegregation, or actually non-discriminatory oper-

"VI.

"Miscellaneous.

"(a) Whenever the word 'parents' is used herein, it shall mean both parents of any child where both parents are living and residing in a household together with the child, or the parent with whom the child resides or who has custody of the child in the event of the parents living apart or of the parents having been divorced, or in the case of a guardian other than the natural parents of the child having been duly appointed, the word 'parents' shall mean such guardian, or if there be more than one guardian, then all such persons who have been duly appointed guardians, or if the child is residing with a person standing in loco parentis, the word 'parents' shall mean such person, or if more than one person, then all such persons standing in loco parentis.

"(b) These regulations are promulgated pursuant to the authority expressly conferred by the laws of the State of Arkansas, including without limitation Act 461 of the Acts of the General Assembly of the State of Arkansas for the year 1959. The full text of these regulations shall be published for one time in the Arkansas Gazette and in the Arkansas Democrat with the said publications to be as soon as possible after the adoption hereof, and said regulations shall be in full force and effect from and after the date of said publications.

"Board of Directors
"Little Rock School District
"Everett Tucker, Jr.,
    President
"Russell H. Matson, Jr.,
    Vice-Pres.
"Ted Lamb, Secretary
"J. H. Cottrell
"B. Frank Mackey
"W. Clinton McDonald"

ation, of the schools at the high school level at this time and the acts of the defendants, and the procedures followed and being followed by them, have clearly been within the framework of the governing court orders and decisions.

"(6) All allegations of the motion for further relief are denied except those expressly admitted above and those that require no comment because they pertain to court orders and decisions that speak for themselves."

On the same date, August 21, 1959, the defendants filed an amendment to the response, in which they alleged:

"In paragraph II (2) of their response, the defendants stated that Thelma Mothershed and Melba Pattillo had filed applications for reassignment. To date 65 white and Negro students have filed applications for reassignment, but a recheck of the records of the District reveals that neither Thelma Mothershed nor Melba Pattillo has filed an application. Therefore, they have refused to comply with the regulations of the Board and have not exhausted or made any attempt to exhaust their administrative remedies. By reason thereof, they are barred from pursuing any judicial remedies they might otherwise have had, and this motion must be dismissed. With reference to those students who have filed applications for reassignment and all other students who pursue their administrative remedies in compliance with the regulations of the Board and applicable assignment laws, the Board is proceeding and will proceed to hear and process the applications expeditiously, in good faith and in a non-discriminatory manner. Hearings on applications for reassignment are being scheduled with the first hearings already set for August 28, 1959."

On September 19, 1959, fourteen Negro students filed their motion to be allowed to intervene, which motion was granted September 23, 1959. In the intervention, it was alleged:

"1. The minor applicants for intervention herein are some of the 'other Negro students who are members of the class represented by the named plaintiffs in this cause' referred to in paragraph 1b of the Plaintiffs' Motion for Further Relief which was filed in this court on August 8, 1959.

"2. Applicants for intervention are among those generally classified as Negroes, are citizens of the United States and of the State of Arkansas, and are residents of and domiciled in the City of Little Rock, Arkansas. The minor applicants for intervention are within the statutory age limits of eligibility to attend the public schools of said City and possess all qualifications and satisfy all requirements for admission thereto. The adult applicants for intervention are the parents, or persons standing in *loco parentis,* of the minor applicants for intervention, and are taxpayers of the United States and of said State and City.

"3. Applicants for intervention should be permitted to intervene as parties-plaintiff in this action upon the following grounds:

"a. They are members of the class on behalf of which the original action is brought;

"b. They have substantial interest in the subject matter of the action;

"c. They are and will be bound by and benefit from any judgment, decree, or order entered or to be entered in this action;

"d. Their complaint and the original action have questions of law and fact in common;

"e. Their intervention will not to any extent delay or prejudice the further adjudication of the rights of the original parties."

This cause proceeded to trial to the court on March 22–23, 1960. The response of the defendants to the original motion for further review was treated as a response to the intervention heretofore set forth.[3]

In the consideration of the contentions of the parties certain undisputed background facts should be borne in mind.

The Board of Directors in charge of the schools on August 27, 1956, when the plan for operating the schools on a nondiscriminatory basis was approved, Aaron et al. v. Cooper et al., D.C., 143 F.Supp. 855, resigned, and in December 1958 the present members, Messrs. Tucker, Matson, and Lamb, were elected along with Messrs. Ed. I. McKinley, Jr., Ben D. Rowland and R. W. Laster. At that time the high schools were closed and had been since September 12, 1958, by proclamation of the Governor issued under Act 4 of the Second Extraordinary Session of the General Assembly of Arkansas. There was also an entirely new administrative staff and an entirely new group of attorneys representing the School District. Mr. Terrell E. Powell had replaced Mr. Virgil Blossom as Superintendent, and Mr. Paul Fair had become the new Assistant Superintendent. The new Board elected in December 1958 qualified, and the first event in sequence of time was a hearing before this court on January 6, 1959, 169 F.Supp. 325, for the purpose of determining and fixing the provisions and terms of the decree of the court in accordance with the mandate of the United States Court of Appeals for the Eighth Circuit, issued December 2, 1958, and filed herein December 4, 1958, 261 F.2d 97. The new Board was confronted with the duty of familiarizing itself with all the proceedings that had occurred prior to its election. On January 9, after the hearing on January 6, the court entered the order hereinbefore referred to, giving the

defendants 30 days in which to file its report. The report was filed, but at that time the high schools were still closed by the action taken by the Governor of the State of Arkansas, under Act 4 of the General Assembly of the State of Arkansas. In its report the defendants asked permission to open the schools on a segregated basis, pending additional study and a further report. The plaintiffs strenuously objected to the opening of any of the high schools on a segregated basis, and the court refused to permit the schools to be opened on a segregated basis. See footnote 1. However, the defendants were unable to proceed because of the closing order heretofore referred to.

The Board gave careful and full consideration to ways and means of coping with the situation with which it was confronted. The Board held many meetings and discussions in an effort to find some way in which to proceed under the law and to operate a nondiscriminatory system of schools. The members of the Board were not in full agreement, and primarily because of action taken by the Board on May 5, 1959, petitions were circulated and a recall election was ordered. At the recall election Messrs. Tucker, Matson and Lamb were retained, but Messrs. McKinley, Rowland and Laster were recalled. Thereafter in June 1959, Messrs. Cottrell and Mackey were appointed to the Board, and in July 1959 Mr. McDonald was appointed to the Board. In the meantime, the three-judge court was considering the constitutionality of the school closing act, and on June 18, 1959, entered its decree, holding the closing acts unconstitutional. Footnote 1, and Aaron et al. v. McKinley et al., D.C., 173 F.Supp. 944. From the date that decree was entered, June 18, 1959, the newly constituted Board, consisting of the present defendants, met almost continuously at a tremendous personal sacrifice in a dedicated effort to

---

3. At the trial ten witnesses were introduced by plaintiffs together with nine exhibits. The defendants introduced two witnesses together with 76 exhibits. De-

fendants' Exhibits Nos. 6 and 27–76 were received in camera and will be further referred to in the course of the opinion.

open the schools in the manner provided and required by law.

Because the high schools were closed during the 1958–59 school year, the thousands of students had been admitted to other schools, and for that reason it was necessary for the Board to require a registration of all students at the high-school level. Registration was set for July 21 through July 24, 1959, and there were some 2,600 pupils registered. It was necessary for the Board to know approximately how many pupils would attend the high schools. It knew that there were cross registrations between the public high schools and various private high schools in many instances. Therefore, the Board requested that each student state his or her preference in the request for original assignment. Also, a question was asked whether the student intended to attend the school to which he was assigned.

During the registration period six Negro students, including the plaintiffs William Norwood and Reuben Robinson, registered at Hall High School. Three Negro students, including the plaintiff Lee Andrew Hill, registered at Technical High School, and 50 Negro students, including the plaintiffs William Massie, Jr., Merriam Lupper, Ilona Weaver, Margretta Motley, John Gray, Jane Hill, William Crout, Fred C. Craig, Phillip B. Ingram, Joyce Miller, and Edna Marie Schockley, registered at Central.

The registration was completed on July 24, 1959, and it is important to keep in mind that the high schools were scheduled to be opened on August 10. The opening date was set in order to give the high school students an orientation period prior to the regular opening of schools in September. It was necessary for the Board to make initial assignments as soon as possible so that any protesting white or Negro child could bring to the attention of the Board his or her objection to the assignment and to request reassignment in ample time to have the question determined prior to the beginning of regular school work in September. The Board had the tremendous task of assigning between 2,500 and 3,000 high school students, and, after obtaining all the information possible from school records, it proceeded to make the initial assignments on July 29. The defendants and all the school personnel worked constantly on the multitude of details. It was thought to be necessary to set up an elaborate identification system as part of the procedure designed to insure order and the proper operation of the schools without undue interference by unauthorized persons. School supplies had to be obtained and plans for employment of guards were formulated. Teachers had to be obtained.

In retrospect it is difficult for a person not intimately acquainted with the facts and conditions existing in July 1959 to appreciate that the normal and simple objective of opening and operating high schools seemed an almost insurmountable task, but those of us who know the facts and are familiar with prior events realize the enormity of the task that was confronting the defendants.

Prior to the making of the initial assignments, the Board adopted the regulations heretofore set forth in footnote 2.

At the time of the making of the initial assignments, the Board recognized that as a practical matter the degree of completeness of consideration could not be given the making of the initial assignments that might be given in the case of an application for reassignment.

Under the tremendous stress and pressure existing in July 1959, the defendants exercised a high degree of good faith and patience in the consideration of the many problems that were confronting them.

On that date, July 29, 1959, the Board assigned three Negro children to Central High School and three Negro children to Hall High School. There had been no Negro students in Hall High School prior to that time. No previous Board

had apparently considered assigning any Negro students to the Hall High School.

The two movants in the motion for further relief, Thelma Mothershed and Melba J. Pattillo, were assigned to the Horace Mann High School pursuant to reports of school officials presented to and analyzed by the Board. In the case of Melba J. Pattillo it was determined that she had been unable to make the necessary adjustment and that it was to her educational advantage to attend Mann rather than Central. The investigation revealed that Thelma Mothershed had an impairment in her health which made it to her best interest to attend a one-story school building such as Mann, rather than a multiple-storied building such as Central. The remaining 51 Negro students who had registered at Hall, Central and Technical were assigned to Mann rather than to the schools at which they had registered.

The plaintiffs strenuously contend that the action of the defendant Directors in making the initial assignments is a deviation from the court-approved plan. It is unnecessary to here set forth the original plan. It appears on pages 859–860 of 143 F.Supp., and was approved in Aaron et al. v. Cooper et al., D.C.E.D. Ark.1956, 143 F.Supp. 855, which decision was affirmed in Aaron et al. v. Cooper et al., 8 Cir., 1957, 243 F.2d 361.

Suffice it to say, integration was to be accomplished by the undertaking of the first phase at the high school level; following successful integration at the high school level, the second phase was to be started at the junior high school level; and following successful integration of the junior and senior high schools, the third phase was to be started at the elementary school level. At the time the plan was adopted and promulgated it was anticipated that the first phase would start in the fall of 1957; the second phase two or three years thereafter in 1959 or 1960; and the final phase two or three years after the start of the second phase, with the entire plan to be in force by approximately 1963. One provision of the plan was to permit any child who was assigned to a school wherein his race was in the minority to transfer to a school wherein his race was in a majority. It is clear that there was a re-districting in that attendance areas were fixed. It is equally clear that student assignment (at that time called "screening") was provided for and permitted by the plan. In fact, at that time there were approximately as many Negro students eligible for assignment solely on the basis of attendance areas to formerly all white schools in 1957 as there are now. The screening then employed under the plan reduced the number to 17, and only 9 attended predominantly white schools.

In discussing the original plan, the United States Court of Appeals for the Eighth Circuit at page 364 of 243 F.2d said:

"The schools of Little Rock have been on a completely segregated basis since their creation in 1870. That fact, plus local problems as to facilities, teacher personnel, the creation of teachable groups, the establishment of the proper curriculum in desegregated schools and at the same time the maintenance of standards of quality in an educational program may make the situation at Little Rock, Arkansas, a problem that is entirely different from that in many other places. It was on the basis of such 'varied' school problems that the Supreme Court in the second Brown decision remanded the cases there involved to the local District Courts to determine whether the school authorities, who possessed the primary responsibility, have acted in good faith, made a prompt and reasonable start, and whether or not additional time was necessary to accomplish complete desegregation."

In Aaron et al. v. Cooper et al., 8 Cir., 1958, 257 F.2d 33, at page 35, the court said:

"On May 20, 1954, following the decision of the Supreme Court in

Brown v. Board of Education on May 17, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, the Board adopted a statement concerning the Brown decision, recognizing its responsibility to comply with Federal Constitutional requirements, and on May 24, 1955—several days prior to the supplemental opinion of the Supreme Court in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, the Board approved a 'Plan of School Integration,' which provided for a gradual integration of all public schools, beginning with the high school level, in the fall of 1957. See Aaron v. Cooper, D.C., 143 F.Supp. 855 for the plan in its entirety, affirmed 8 Cir., 243 F.2d 361."

The court clearly recognized that "screening" or pupil assignment procedures were contemplated under the plan. It said at page 34 of 257 F.2d:

"In conformity with the plan, and under the direction of the Superintendent of Schools of the Little Rock School District (hereinafter called 'District'), approximately sixty Negro students were meticulously screened prior to the opening of schools in September, 1957. Seventeen were accepted for entrance in the final two years in high school, but when eight of the students voluntarily withdrew, the nine remaining attempted to enter the school when it opened."

It was not contemplated that the residential area of a student would of itself determine the school to be attended by the student. The screening procedures first employed by the Board when the plan was approved did not embody the guiding protective provisions now afforded by the present Arkansas Pupil Assignment Law and the School Board Regulations. At that time there were no prescribed procedures for an application for a hearing. The present procedure embodies all of the basic fairness of due process, whereas the former

screening procedure did not. The only practical remedy that a dissatisfied student had then was to go to court, but now he or she can apply for reassignment and in a proper case the reassignment will be granted.

■ None of the plaintiffs nor any other individual student has an absolute right to be assigned to any particular school in the District because of the provisions of the plan or because of residence proximity or any other single consideration, much less because of living within a particular attendance area that was set by a previous Board four years ago, and prior to the enactment of Act 461, the Arkansas Pupil Assignment Law March 30, 1959.

In the case of Dove et al. v. Parham et al., 8 Cir., 1960, 282 F.2d 256, 258, the court, in discussing its opinion in the prior case of Parham v. Dove, 8 Cir., 1959, 271 F.2d 132, said:

"We held, however, that, in view of the enactment of a state pupil placement or assignment statute, Act No. 461 of 1959, Ark.Stats. § 80–1525 et seq., the District would not be summarily required to make admission of the three individual plaintiffs involved to the school they sought to attend, but should be afforded the opportunity to make use of the provisions of the statute as a means or an aid in effecting an orderly location of pupils generally, in relation to the various factors which could be involved as to distribution in its school system, except those of purely racial consideration. 271 F.2d at p. 137.

"The recognition of facial validity which we thus gave to the statute was on the basis of it constituting a 'legislative non-racial scheme', intended to serve in effecting student location through 'overall pattern', instead of by promiscuous result. *Id.* at p. 138. But we cautioned that 'the statute cannot * * * be made to serve through artificial application, as an instrument for

maintaining * * * a system of racial segregation'. Id. at p. 136."

* * * * * *

"That was the basis on which we held in our previous opinion, 271 F. 2d at p. 137, that the District was entitled to a use of the placement or assignment statute in relation to its desegregation task, when we stated that the statute was being accorded recognition 'only as an implement or adjunctive element * * * for effecting an orderly solution to it's (the District's) desegregation difficulties, in proper relationship to its other school-system problems, but with a subservience to the supreme-law declaration of the Brown cases as to all imposed segregation and the obligation owed to get rid thereof within the tolerance entitled to be allowed play under these decisions for accomplishing that result.' "

The plaintiffs further attack the action of the defendants in failing to grant applications for reassignment, and claim that the application of the assignment procedures violated the constitutional rights of the plaintiffs and other Negro children.

Within the ten-day period prescribed by the Board's regulation, 19 Negro students filed applications for reassignments. Likewise 57 white students filed similar applications. Three of the Negro students were assigned to Central. One of the Negro students did not appear at the hearing, and one withdrew his application before the hearing. In addition to Thelma Mothershed and Melba J. Pattillo, neither of whom filed an application for reassignment, parties to the original motion for further relief, 14 Negro students filed the intervention heretofore set forth. Four of the 14 did not complete the administrative procedure. None of the Negro students who applied for reassignment proceeded in the Circuit Court as prescribed by the Arkansas Pupil Assignment Law. Thirty-two of the 57 white students completed the reassignment procedure, and the Board held 49 hearings as required

by the regulation and the Arkansas Pupil Assignment Law (Act 461, Acts of General Assembly of Arkansas for the year 1959).

The court is of the opinion that when the plaintiffs completed the administrative procedures before the Board and the Board had rendered its decision on the applications for reassignment, they were not required to appeal from such decision to the State Circuit Court for the reason that the appeal to the State Circuit Court is a judicial procedure and not an administrative procedure. The filing of the petition for appeal would be tantamount to the institution of a lawsuit in the state court, and the plaintiffs were not required to resort to the state courts for the protection of rights guaranteed by the Constitution of the United States, Amend. 14. Dove et al. v. Parham et al., 8 Cir., 1960, 282 F.2d 256.

Section 9 of the Pupil Assignment Law provides adequate administrative remedies before the Board for the protection of such rights, and such remedies must be pursued individually before a student may invoke the jurisdiction of a federal court.

In Parham v. Dove, 8 Cir., 1959, 271 F.2d 132, in discussing the Pupil Assignment Law, the court, beginning at page 139, said:

"The statute makes of the Board the equivalent of an administrative tribunal, with the power and duty of engaging in adjudicatory function, including the consideration of the possibility of constitutional violation in relation to its result. No more than in the case of any other administrative agency, or of a court, does it seem to us that there can properly be recognized an anticipatory right to brand such a proceeding before the Board, in its official responsibility for administration of the statute, as being legally futile and so unnecessary. Even the important problem of school desegregation cannot soundly permit of

such a departure from established legal concept and fundamental principle.

"It is for this reason that we think there is controlling here, and that we adopt, what was said in Carson v. Board of Education, 4 Cir., 227 F.2d 789, 790: 'Where the state law provides adequate administrative procedure for the protection of such rights, the federal courts manifestly should not interfere with the operation of the schools until such administrative procedure has been exhausted and the intervention of the federal courts is shown to be necessary'.

"In a subsequent case, Carson v. Warlick, 4 Cir., 238 F.2d 724, certiorari denied 353 U.S. 910, 77 S.Ct. 665, 1 L.Ed.2d 664, the court, in an opinion by the late Chief Judge John J. Parker, made reiteration of this judicial limitation, holding that the plaintiffs there were not entitled to seek judicial relief, 'for the reason that it nowhere appears that they have exhausted their administrative remedies under the North Carolina Pupil Enrollment Act, and are not entitled to the relief which they seek in the court below until these administrative remedies have been exhausted'. At page 727 of 238 F.2d. See also Holt v. Raleigh City Board of Education, 4 Cir., 265 F.2d 95, 98."

■ Therefore, those plaintiffs who failed to exhaust the required administrative procedures before the Board have no standing in court to question the action of the Board.

■ This brings the court to a consideration of whether the constitutional rights of those plaintiffs, including intervenors, who have exhausted their administrative remedies, have been violated by the action of the Board on their applications for reassignment.

The defendants introduced the record of the 49 separate hearings as Exhibits 27–76, both inclusive. Examination of these exhibits, together with Exhibit 6 introduced by the defendants, was limited at the request of the parties to access only by the parties, their attorneys, and the court. It would unduly extend this opinion to review all these in camera exhibits. The court has examined and read all of them. They disclose a complete and unbiased consideration of all facts pertaining to the applications for reassignment. The reasons assigned by the Board for the action taken in each case, as disclosed by Exhibit 6, are fully justified by the facts.

The court does not feel at liberty to reveal the identity of any of the applicants in the discussion of the contents of his application or the conclusion reached by the Board, but is setting forth in substance a typical record of the application and conclusion of two of the students, selected at random, in footnote 4.

4. One of the students in his exception to the final action of the Board alleged:
"The action of the Board denies rights of (name omitted) guaranteed under the Constitution of the United States and/or under the laws of the State of Arkansas in the following particulars:
"The actions of the Board of Directors and/or its subordinates and employees constitute racial-discrimination and thereby deny to our child rights protected by the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, and further on the ground that actions of the Board of Directors with respect to our child were contrary to the provisions of the plan of desegregation adopted by the Board of Directors and judicially ordered to be enforced by several decisions of the Supreme Court of the United States, the United States Court of Appeals for the Eighth Circuit, and the United States District Court for the Eastern District of Arkansas in litigation, to which the Board of Directors was a party, variously styled in different proceedings as Cooper v. Aaron, Aaron v. Cooper and Aaron v. McKinley."
The testing and interviews occurred on August 31, 1959. The record contains a full psychological report as well as other information.
A hearing was held before the Board on September 9 attended by the student, his parents, and his attorney. After setting

In the first Brown decision, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, the Supreme Court condemned compulsory segregation in public schools as violating rights of Negro school children guaranteed by the equal protection clause of the Fourteenth Amendment, but the Court kept the cases on the docket and requested further argument on questions 4 and 5, previously propounded by the Court for reargument, before entering an implementing decree. Question 4, which ap-

forth the facts as developed at the hearing and excerpts from the statements made by the student's father, as well as the student himself, the Board concluded:

"——————— and the overall education program of the District would undoubtedly progress better and in view of the overall circumstances involved in this case, ——————— would obviously have more educational opportunity at Mann than at Central. His transfer under his home and the other circumstances existing at this time would be to his detriment and would be to the detriment of the academic program and standards and academic progress of other students in the school system. It rather plainly appeared that ——————— might well be subjected to rather powerful forces at home and at school which, during his formative years, might well have an adverse effect upon his future life. Under all of the circumstances, he would be much better off continuing his education with his friends under normal conditions.

"Conclusions.

"Under the findings set forth above, it is the unanimous opinion and conclusion of the Board that the requested reassignment of ——————— from Mann High School to Central High School would not be in the best interests of ——————— and of the educational program of the District and that his application be disapproved."

The application of the other student is in identical words except for the name as the one above referred to.

The interview and testing of this applicant occurred on September 3, 1959, and the hearing was held at a later date. Omitting the formal parts, the findings and conclusions of the Board in that case were as follows:

"——————— attended Dunbar Junior High School and last year took the first half of 11th grade English and history by correspondence from the University of Arkansas. He made a grade of 'B' on one and 'D' on the other. Most of his friends attend Mann and if he were assigned to Central he would be among strange teachers and students.

"——————— was interviewed by the School Psychologist who reported to the Board and his History Sheet and scholastic background were examined by the Board.

"——————— did not enter school at the time the schools were opened and, therefore, has not been in compliance with the attendance regulations of the Board. His explanation was 'I want to know what school I am going to before I go.' ——————— maintained a belligerent and unsatisfactory attitude during the hearings, which clearly reflect that an adjustment problem would be presented in the event his application were approved.

"He attended the meeting of students who were not in compliance with the Board's regulations for attendance at Dunbar Community Center and gave the reason for the meeting that the students wanted a press conference so that the press could be informed why they were not going to school. It was his opinion that the Board got its information on the reasons by virtue of being a member of the public. He stated that he would not comply with the Board's action on his application for reassignment but would take correspondence courses before attending Mann. Apparently his principal reason for requesting the application was 'I had rather integrate.'

"Based upon all the evidence considered by the Board it was obvious that ——————— would undoubtedly progress better at Mann than at Central and there were more education opportunities and school activities available for him at Mann than at Central. He is not sufficiently prepared to cope with the adjustment problem that would undoubtedly arise and his transfer would be to his detriment and to the detriment of the curricular and academic program and standards and academic progress of other students at Central.

"Conclusions.

"Under the findings set forth above it is the unanimous opinion and conclusion of the Board that the requestion reassignment of ——————— from Mann High School to Central High School would not be in the best interests of ——————— and of the educational program of the District and that his application is unanimously disapproved."

pears in footnote 13 at page 495 of 347 U.S., at page 692 of 74 S.Ct., reads as follows:

"4. Assuming it is decided that segregation in public schools violates the Fourteenth Amendment

"(a) would a decree necessarily follow providing that, within the limits set by normal geographic school districting, Negro children should forthwith be admitted to schools of their choice, or

"(b) may this Court, in the exercise of its equity powers, permit an effective gradual adjustment to be brought about from existing segregated systems to a system not based on color distinctions?"

Three lines of argument were made to the court on the question of relief. On one side the plaintiffs argued that there was no justification, legal or factual, for any delay in enforcing their constitutional rights, and that the court should require desegregation "forthwith." On the other side, it was pointed out that racial segregation had been in existence in more than one-third of the states and in the District of Columbia for at least a century; that during that time it had the sanction of decisions of the Supreme Court and was believed by many to be necessary in order to preserve amicable relations between the races; and that school segregation was part of a major social pattern of racial relationships which reflect the mores and folkways prevalent in large areas. The defendants contended, therefore, that the court should not go beyond its declaration of the constitutional principle, and should leave implementation to the voluntary conduct of the communities and individuals without imposing any limitations as to time. Others, including the United States of America, proposed a middle course by suggesting that the cases be remanded to the lower courts with directions to require defendant school boards to either admit plaintiffs forthwith to nonsegregated schools or to propose, for the lower courts' consideration, an effective plan for accomplishing desegregation as soon as practicable.

The court, after hearing these arguments, held, beginning at page 300 of 349 U.S., at page 756 of 75 S.Ct.:

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. * *

"While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school trans-

portation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system."

Subsequently in Cooper v. Aaron, 358 U.S. 1, at page 7, 78 S.Ct. 1401, at page 1404, 3 L.Ed.2d 5, the court said:

"Under such circumstances, the District Courts were directed to require 'a prompt and reasonable start toward full compliance,' and to take such action as was necessary to bring about the end of racial segregation in the public schools 'with all deliberate speed.' Ibid. Of course, in many locations, obedience to the duty of desegregation would require the immediate general admission of Negro children, otherwise qualified as students for their appropriate classes, at particular schools. On the other hand, a District Court, after analysis of the relevant factors (which, of course, excludes hostility to racial desegregation), might conclude that justification existed for not requiring the present nonsegregated admission of all qualified Negro children. In such circumstances, however, the courts should scrutinize the program of the school authorities to make sure that they had developed arrangements pointed toward the earliest practicable completion of desegregation, and had taken appropriate steps to put their program into effective operation."

The defendants followed the law as declared by the United States Court of Appeals for the Eighth Circuit where that court, speaking through Chief Judge Harvey M. Johnsen, in Parham v. Dove, supra, beginning with the last paragraph on page 136 of 271 F.2d, said:

"Thus, so far as the face of the statute is concerned, there is no basis to say, in legal construction, that the Act is designed, or that it can only operate, to maintain segregation and to prevent integration in a school system. On the other hand, as emphasized in the Shuttlesworth case, 162 F.Supp. at page 384, the statute cannot, because of its facial constitutionality, be made to serve through artificial application, as an instrument for maintaining or effecting a system of racial segregation. It cannot be given an application designed to escape or by-pass the Brown cases. Recognition of and obedience to the holdings of the Brown cases must implicitly exist in its operation and application.

"Accordingly, any scrutiny which the federal courts may be called upon to make of what has been done under such a statute, where a charge of racial discrimination is involved, must necessarily be within the focus and tests of its lack of disharmony with the objective, the obligation and the responsibility dictated by the Brown Cases. Insofar as the question of desegregation is concerned, a placement or assignment statute, such as the Arkansas Act, is entitled to have play, on the basis of state sovereignty, as a means or an aid for effecting a sound and orderly distribution of pupils, in relation to all the problems of a public school system, except those of purely racial consideration. Differences in the practical problems of eliminating racial segregation under the varying situations of states or local districts must look for their margins of latitude in effecting that result to the principles

laid down in Brown v. Board of Education, 349 U.S. 294, 299–300, 75 S.Ct. 753, 756, 99 L.Ed. 1083.

"In this field of constitutional paramountcy, a placement or assignment statute is entitled to be accorded recognition only as an implement or adjunctive element on the part of a state for effecting an orderly solution to its desegregation difficulties, in proper relationship to its other school-system problems, but with a subservience to the supreme-law declaration of the Brown cases as to all imposed segregation and the obligation owed to get rid thereof within the tolerance entitled to be allowed play under these decisions for accomplishing that result.

"But there is no need here to extend further these generalized observations. Reverting to the facial constitutionality of the Placement Act, it follows that the plaintiffs are without any general public-school right under Arkansas law to seek admission to a particular school, except on the basis of and in accordance with the provisions of that Act. While their federal constitutional rights have been previously violated in that they have been required to attend a school segregated under administrative authority, the Placement Act provides a means for them now to seek admission to the school which they think they are otherwise entitled to attend and, insofar as the provisions of the Act are concerned, have their right to do so determined without regard to their race or color.

"Section 4 of the Act permits a Board of Education to delegate to the Superintendent of Schools the general task of making assignment of pupils among the schools of a District. But Section 7 makes provision for a right on the part of a parent or guardian of a pupil to file objections in writing to an assignment so made, to make request for a transfer of the pupil to a designated school, and to demand a hearing. The Board is required in such a situation to hold a hearing within a fixed time and to allow the presentation of evidence. 'It shall be the duty of each local Board to hear and consider all witnesses appearing before the said Board and having information pertinent and relative to the matter and to consider all relevant documentary evidence.' 'No final order shall be entered in such case until each member of the board of education has personally considered the entire records.' * * *

"The Board must make findings of fact as a basis for its decision, 'and such findings and action shall be made a part of the records of the local Board.' Also, as has been mentioned above, there is a provision for having any claim of unconstitutionality in its action called to the Board's attention, through allowing to be filed 'an exception before such Board to the final action of the Board as constituting a denial of any right of such minor guaranteed under the Constitution of the United States * * *.'"

The court in its study of the individual applications for reassignment, the facts developed at the hearings and the conclusions reached by the defendants has endeavored so far as possible to consider separately the factual question and the question of law involved in each application. The established facts as disclosed by the record of the hearing have been scrutinized in an effort to make certain that the constitutional rights of no student have been violated. The conclusions of the defendants are not based upon any hostility to racial desegregation, and point unerringly to the development of a program "pointed toward earliest practical completion of desegregation" within the meaning of the Brown decisions.

In the study of the actions taken by the defendants and attacked by the plaintiffs and the intervenors, the court has borne in mind that the actions of the defendants in the consideration of the applications for reassignment were required to be "within the focus and tests of its lack of disharmony with the objective, the obligation and responsibility dictated by the Brown cases."

In Dove et al. v. Parham et al., supra, the court said:

"Standards of placement cannot be devised or given application to preserve an existing system of imposed segregation. Nor can educational principles and theories serve to justify such a result. These elements, like everything else, are subordinate to and may not prevent the vindication of constitutional rights. An individual cannot be deprived of the enjoyment of a constitutional right, because some governmental organ may believe that it is better for him and for others that he not have this particular enjoyment. The judgment as to that and the effects upon himself therefrom are matters for his own responsibility.

"In summary, it is our view that the obligation of a school district to disestablish a system of imposed segregation, as the correcting of a constitutional violation, cannot be said to have been met by a process of applying placement standards, educational theories, or other criteria, which produce the result of leaving the previous racial situation existing, just as before. Such an absolute result affords no basis to contend that the imposed segregation has been or is being eliminated. If placement standards, educational theories, or other criteria used have the effect in application of preserving a created status of constitutional violation, then they fail to constitute a sufficient remedy for dealing with the constitutional wrong."

There is no evidence that the defendants have used the Arkansas Pupil Assignment Law of March 30, 1959, as an instrument for maintaining or effecting a system of racial segregation. On the other hand, it is clear that the defendants are using the Act as a means or an aid for effecting a sound and orderly distribution of pupils in relation to all problems of the public school system except those of purely racial consideration. Therefore, the claims of the plaintiffs and the intervenors of racial discrimination are without merit.

■ There were four Negro students who completed the administrative procedures before the Board but who are not named plaintiffs or intervenors. These students are Alice Louise Flakes, John Albert Jones, John Dickey Miller, and Carmela Jean Sells. Since they are not parties to this proceeding, the court is without jurisdiction to adjudicate their claim of a violation of their constitutional rights, if, indeed, such a claim is made. The record does not disclose whether these four students are attending school, and if so what school they are attending, or whether they desire to assert any claim.

In Carson v. Warlick, 4 Cir., 1956, 238 F.2d 724, at page 729, the court, speaking through the late Chief Judge John J. Parker said:

"There is no question as to the right of these school children to be admitted to the schools of North Carolina without discrimination on the ground of race. They are admitted, however, as individuals, not as a class or group; and it is as individuals that their rights under the Constitution are asserted."

■ The right of Negro students to be admitted to the schools of the Little Rock School District without discrimination on the ground of race has been firmly recognized and adjudicated. This right extends to all Negro school children as individuals, and if a student is not admitted to a school of his choice

after exhausting his administrative remedies before the School Board, he has a right as an individual to assert and to maintain a suit upon the allegation that his or her constitutional rights have been violated. But, as stated by Judge Parker, he must appear individually and not as one of a class.

At the trial the plaintiffs objected to certain testimony given by one of the defendants, Mr. Tucker, on the ground that some of the testimony given by him was inadmissible as hearsay, and at the conclusion of the testimony of Mr. Tucker in chief, the plaintiffs moved to strike all of the testimony of the witness pertaining to the environment, conditions, and isolation and situation of the Negro students now enrolled in Central and Hall High Schools, and all testimony pertaining to a letter and contents regarding a visit from a Congressman to Little Rock as not being the best evidence, as being hearsay, and not relevant.

At the time the court deferred ruling on the motion. Since the trial a transcript of all of the testimony of Mr. Tucker has been examined, and the court is of the opinion that the testimony objected to is relevant and admissible. Any isolated statements made by the witness, not based upon authentic records and reports made in the due course of the business of the school and under the direction of the Board of Directors, have been entirely disregarded by the court.

The plaintiffs also objected to the testimony of Dr. John E. Peters, a specialist in child psychiatry and Associate Professor of Psychiatry and Director of the Child Guidance Clinic at the University of Arkansas Medical School. The court has reexamined the testimony of Dr. Peters, and is of the opinion that his testimony is relevant and admissible.

Other contentions made by plaintiffs in the 64-page brief submitted to the court appear to be included in the issues decided by the court, or, if not embraced therein, are without merit, and it is not necessary to extend this opinion by further discussion of such contentions.

■■ It must be remembered that the decisions of the Supreme Court of the United States and other appellate courts do not compel the mixing of the different races in the public schools. No general reshuffling of the pupils in any school district has been commanded. The law is simply that no child shall be denied admission to a school on the sole basis of race or color. In other words, the Constitution of the United States does not require integration. It merely forbids the use of governmental power to enforce segregation. In Aaron v. Cooper, 143 F.Supp. 855, (the first court decision of the long list of decisions involving the Little Rock schools), this court said:

"It is not the duty or function of the federal courts to regulate or take over and operate the public schools. That is still the duty of the duly state-created authorities, but the free public schools must be maintained and operated as a racially nondiscriminatory system." At page 864.

"The federal trial court should maintain, if possible, a harmonious relation between state and federal authorities where the state authority, in this instance the Board of Directors, is proceeding in good faith to discharge its duties, and thus to establish within a reasonable period of time a nonracial system of schools as required by the supreme law of the land." At page 865.

"This court is of the opinion that it should not substitute its own judgment for that of the defendants. The plan which has been adopted after thorough and conscientious consideration of the many questions involved is a plan that will lead to an effective and gradual adjustment of the problem, and ultimately bring about a school system not based on color distinctions." At page 866.

■ The law requires and the plan provides for a transition from a constitutionally discriminatory school system to a constitutionally nondiscriminatory school system. While this transition is in progress, we cannot lose sight of the realities and practicalities of the situation. We are dealing with children and their education, and the courts must consider the constitutional rights of the child along with the requirements of the school systems, and whether such requirements correspond with or conflict with the wishes of some of the students and their parents. It is understandable that certain students, as well as their parents, may entertain an abstract view of their rights or welfare that is not shared by the local school officials, who must constantly, in the solution of the varied problems and during the transition period, keep before them the broader prospective of the rights of students and the requirements of the school system. This broader prospective, implemented in good faith, may well necessitate during the transition period a denial of the wishes of a particular child or his parents. In relation to the problem of general achievement the court is entitled to require that the enjoyment of the right to desegregation "be geared to a reasonable, definitive, transitional program of 'all deliberate speed.' "

Under the facts in the instant case, the defendants have made every attempt and, in fact, are following a transitional program with "all deliberate speed." The law does not require that the door be open for admission on a "first come, first served" basis. If it were otherwise, we would soon have no order and no school system.

The courts have often recognized that many individual liberties guaranteed by the Constitution are not and cannot be unlimited. For example, there is no such thing as complete freedom of the press or speech, nor is there an unlimited or unrestrained freedom of students, white or colored, to select and "crash" their way into a particular school under the guise of choosing the direction in which their constitutional advantages lie.

Aside from the strictly constitutional or legal point of view, dedicated school officials must be and are concerned with transition in the sense of making the change in a manner to reach the desired end result without destroying children and the system in the process, and to arrive at a state of operation of a constitutional school system wherein all children can get at least as good an education, and preferably better, as was available to them in the former school system. The closer the goal is approached, the more successful is the transition. Realistically, everyone knows that the principal obstacles to the achievement of the ultimate goal arises because school boards are dealing with children with different backgrounds, race, academic achievement, emotional stability, ability to adjust emotionally under new and trying circumstances, and other relevant factors, rather than physical plant, teacher load, transportation, etc.

■ The defendants in the operation of the public school system in Little Rock must take the children as they find them. If, after application of assignment standards and criteria, the School Board in good faith concludes that particular children cannot make the change without injury to themselves or to other children with whom they will be associated, and to the school system, it should and must take action which will not subject the child to the change. In the application of these standards, if it appears that because of conditions arising from a social pattern, or otherwise, many children are not able to satisfactorily make the change in the early stages of the transition, this is merely the result of the indiscriminate application of the legal criteria and standards and obviously does not reflect or indicate unconstitutional discrimination.

The court believes that as time passes and the transition progresses, application of the same standards and criteria will progressively produce entirely dif-

ferent results as to the ability of particular students to make the change without unwarranted injury to themselves, other students and the school system.

It is not necessary for the court to refer again to the chaotic conditions that existed in the Little Rock high schools during the school year of 1957–58. However, those conditions cannot be forgotten by a law-abiding people. The defendants, through their dedication to their duties under the law and in a conscientious effort to do justice to all under the law, have brought order out of chaos. They deserve the support of every person who has an interest in the maintenance of a free school system operated in accordance with constitutional principles, to which we so often glibly give lip service.

In considering whether school authorities have discharged their primary responsibility in solving the problems of the operation of a nondiscriminatory school system, courts are required to consider whether the action of such authorities constitutes good-faith implementation of the governing constitutional principles. The court has so considered the questions before it in this case, and is convinced that the action of the defendants herein complained of by plaintiffs was performed in the utmost good faith without bias or prejudice and with a desire and intention to protect and to enforce the constitutional rights of all concerned.

Therefore the motion of plaintiffs and of the intervenors should be dismissed, and an order in accordance herewith is being entered today. And it appearing that the enforcement of the rights heretofore recognized and adjudicated are personal to those who may assert that their rights have been and are being violated, there is no reason for the court to retain jurisdiction, and the order will omit provision for the retention of jurisdiction.